### ISAAC McDANIELS *v.* GEORGE W. ROBINSON.

*The Liability of Innkeepers. What constitutes the relation of Guest. The extent of the Responsibility of Tavernkeepers for goods stolen or lost.*

The relation of guest is created by a person's putting his horse at an inn, and it will be extended to all his goods left at the inn by his taking a room, and taking some of his meals at the inn, and lodging there a portion of the time.

Therefore, it is not necessary that the traveler should take all his meals at the inn, or lodge there every night, in order to create the relation, or constitute himself a guest.

McDaniels *v.* Robinson.

And though the property or money of the guest may be lost by a burglarious entry of the innkeeper's house, under such circumstances as to excuse him from all negligence, and also from liability to his guest , still he cannot be exonerated from the loss of the goods upon presumption merely, or without proof of some of the circumstances ordinarily attending the breaking of a house securely fastened.

The delivery and acceptance of the goods are a sufficient consideration for any undertaking in regard to them, even when the service is gratuitous.

In the present case, the plaintiff delivered a sum of money to the defendant to keep, and after he had so delivered the money, and defendant had accepted it, the plaintiff requested defendant to take the money to one Dr. Swift, to keep over night, and the defendant agreed so to do; *it was held* that this new contract was not inconsistent with the continuance of the former one, and only provided a new mode of discharging the former one, and that it produced no effect upon it unless or until performed.

What constitutes the relation of guest, and also the extent of tavernkeepers' responsibility for goods stolen or lost, considered and discussed.

The parties being made witnesses in this state, are witnesses to every point material to the determination of the case.

ASSUMPSIT for $4,000, it being two hundred twenty dollar gold pieces, left with the defendant, who was an innkeeper, for safe keeping.

Plea the general issue and trial by jury.

On the trial, the plaintiff offered testimony tending to prove that from the 26th day of February 1851, to the 6th day of March following, and before and after those dates, the defendant was the keeper of a public inn, at Bennington Center village, in the county of Bennington, but without any license therefor from any civil authority; that on the evening of the said 26th day of February, the plaintiff, whose place of residence was in Granville, in the state of New York, came to said Bennington on business connected with the Stark Bank, which is situated in the village of East Bennington, one mile distant from said inn, went to said inn with an associate, one Thomas C. Robinson, and that they were received by the defendant as guests therein; that the plaintiff brought with him when he so came to said inn, a horse, wagon, harness and buffalo robe, which were also at the same time received by the defendant, and were kept by him at his stables, connected with said inn, from the evening of said 26th day of February, to the said 6th day of March, inclusive; that the plaintiff lodged and took his meals,

and occupied a room numbered 10, at said inn without interruption, from the time of said arrival until after breakfast on Saturday, the first day of March, when he went out, and was engaged in business through the day in said East Bennington, taking no other meals except breakfast at the defendant's, and at night went to the house of his brother, Thomas McDaniels, in the East Village in said Bennington, one and one half miles from said inn, where he staid until the next following Monday morning after breakfast, when he went to said inn, and dined there on said last mentioned day; that he went back to his brother's to tea, lodged there that night, and took breakfast there the following Tuesday morning. That he returned to and dined at said inn on said Tuesday, and continued there, and lodged and took his meals there, until about half past five o'clock, P. M. of the following Wednesday, the 5th day of said March, when he went back to the house of his said brother to transact some business with him, and took tea there, and staid there through the night; that he returned on the morning of the next day soon after breakfast, the 6th day of said March, and dined and took tea at said inn; that the plaintiff when he first came to said inn, engaged for his use while he should stay at said inn, the said room numbered 10, and during all the time he spent at said inn, as before stated, he occupied said room, both by day and night, and fires were at all times provided for him in said room by the defendant, whenever the plaintiff was at said inn, as aforesaid; that during the whole time, no intimation was given to the plaintiff, that said room was not continuously at his service, and appropriated to his use, and that whenever he was at said inn, as before stated, he resorted to said room and occupied the same without anything being said upon the subject between himself and the defendant, after the original engagement of it, as before mentioned. That on said 5th day of March, in the afternoon, Truman Huling, Esq., brought to said room numbered 10, the sum of four thousand dollars in gold coin, being two hundred double eagles, which was then and there paid to and received by the plaintiff, and was his property; that on the occasion of leaving said inn, on the afternoon of said day, as before stated, the plaintiff delivered to the defendant in said room, the said gold coin tied up in a shot bag; that the defendant said as he took it into his hands, that he did not like to be accountable for so much money; that

thereupon the plaintiff took it, enveloped it in a newspaper, and handed it back to the defendant, saying there was no danger, and requested him at the time, to put it in the tick of the straw bed, in which he, the defendant, slept, and there to keep it through the night, and not to let any one know it, not even his, the defendant's wife, and stating to the defendant, that he was going to his brother's to transact some business, and should not return to said inn until the next morning, and at the same time directing the defendant in case he, the plaintiff, should not return before the departure of the Troy stage the next morning, to deliver the money to Truman Huling, Esq., to give to the stage-driver to carry to Troy for the plaintiff, the said Huling having agreed so to do; that the defendant then left said room No. 10, taking said money with him, and passed down the stairs and into the back part of his house, that the plaintiff went immediately down said stairs and out upon the front piazza, and near to the front door of the main hall of said house, and as he was going down said stairs, he sent for the defendant, who came to him on said piazza, and the plaintiff then said to the defendant, " your house is more exposed to fire than Dr. Swift's; wont you take the money over to Dr. Swift's and let him keep it over night;" and the defendant replied, that he would right away or presently; that at this time the defendant had not the money in his hand, having just previously placed it in said hall, under a stove, about twenty feet distant from the place where the parties then stood, and within the house, and not in the view, or knowledge of the plaintiff, and immediately the plaintiff and said Thomas C. Robinson left said inn, and went to his brother's, as before stated. That the said Swift's dwelling house stood upon the opposite corner of the street, and within a few rods of said inn, and that said Swift was at home, and would have received and kept the money if it had been brought to him for the purpose, although there had been no previous agreement or conversation between himself and the plaintiff on the subject, and the said Swift had no knowledge of the matter.

The only evidence on this point was the testimony of said Swift, who testified that he did not know any reason why he should have refused to receive the money, and supposed he should have received it, if he supposed the plaintiff wished it, but was glad that it was not brought to him.

It also appeared that before the commencement of this suit, the money was demanded by the plaintiff of the defendant, and the defendant replied to the demand, that he had not the money, that it had been stolen from his house, and he could not produce it.

The defendant claimed, that said bag of money was stolen from his house on the night of the fifth of March, by a burglarious entry from without said house, and gave evidence tending to prove, that said money was so stolen, with evidence showing the degree of care bestowed by him in the care and keeping of the same.

Also evidence tending to prove that the plaintiff and his associate, Thomas C. Robinson, left the defendant's house on Friday, February 28th, in the afternoon before tea, and that they did not lodge at defendant's house afterwards, but took up their board and lodging at the house of said Thomas McDaniels, in East Bennington, and had their clothes washed and ironed there, and made that their home while they remained in Bennington, after leaving defendant's house on the said 28th day of February; and that the principal business of the plaintiff in Bennington was with the Stark Bank. That on Sunday, the 2d day of March, while the plaintiff and said Thomas C. Robinson, were staying at said Thomas McDaniels, the plaintiff sent the defendant the following letter:

"Bennington 2 March, 1851.

" G. W. Robinson, Esq.

" Sir,—I wish you would let your man harness up my horse, " and put all the clothes I have in your house in trunk, traveling "bag, or something—also all the papers in table drawer in the "room I used, and also all other things Robinson and I have " in those rooms, and drive down here this evening and fetch them " down. I shall want him to take my horse and wagon back with " him.                    Respectfully,

(Signed)                              "I. McDaniels.

" P. S.   George, it is now dark, and you may send my things " in the morning with your own team.

"I. McDaniels."

That the defendant, in compliance with the request in said letter, on Monday morning, March 3d, sent to the plaintiff, to the house of the said Thomas McDaniels, all the things named in

said letter, belonging or appertaining to the plaintiff and said Thomas C. Robinson, leaving only the horse, wagon, harness and buffalo robe, which were at the stable of said inn. That after the afternoon of Friday, the plaintiff took only two or three meals at defendant's house, before the delivery of the money, and that the board of the plaintiff at defendant's house from the 26th day of February, to the time of the delivery of the money, was two and a half days only.

That the defendant did not after said Friday afternoon reserve said room for the use of the plaintiff, or the said Thomas C. Robinson, but he had no occasion to use it for any other purpose, and did not appropriate it to any other use until after the 6th of March, but there was nothing said between the parties about its being reserved for the use of the plaintiff, and that the plaintiff did not carry the key of said room. That said Thomas C. Robinson did not return to said inn to lodge, after he and the plaintiff left on the said 28th day of February; that at the time of the delivery of the money to the defendant on the said 5th day of March, the defendant told the plaintiff, he would not be accountable for the money.

There was no evidence other than stated, that either party expected or understood that defendant was to receive any compensation for keeping said bag of money, or for carrying it to Dr. Swift's, or for the use of said room.

The defendant's evidence tended also to prove that at the time the plaintiff requested him to take the money to Dr. Swift's, he told the defendant to let no one else know anything about his having the money; that at ten minutes past eight o'clock of that evening, the defendant saw Dr. Swift upon the piazza in front of defendant's house, in company with another person, A. B. Gardner, Esq., and asked said Swift if he was going to be at home, and the said Swift replied that he supposed he should, or that he knew nothing to the contrary; that the defendant was engaged in his business in and about his house after he received said money, until about nine o'clock in the evening, when he took said bag of money, and started to carry and deliver it to said Swift. That he went over to said Swift's house with the money, and found there was no light in any part of the house, except in the room of a sick hired man of said Swift's, in a remote part of the house, that he found no

evidence of any one being up, and supposed said Swift had been called away upon his professional business, and that the other inmates of the house had retired to sleep ; that without entering the house he returned with the bag of money to his own house, and put it under his bed. That early in the morning of the 6th of March, upon discovering the loss of the money, he went to the house of said Thomas McDaniels, and informed the plaintiff that the money was stolen.

That at the time of the delivery of the money to the defendant, the plaintiff had concluded his business in Bennington, with said Stark Bank, and was ready to leave for home.

That on said 5th day of March, and for some days previous, it had been extensively known that the plaintiff was at said Bennington, and had a large amount of specie with him, and that the defendant was apprised of the fact. That on the night of said 5th of March, four stage passengers and two other travelers lodged at said inn, besides the stage-driver, a man servant, a maid servant, and a family boarder.

The plaintiff also gave evidence tending to prove, that the defendant was on terms of much intimacy with the family of said Swift; that the said Swift was not in the habit of fastening the doors of his house at night, and that on one occasion, not long before the said 5th day of March, the defendant entered Swift's house unbidden, in the evening, after the lights had been extinguished for the night, and by invitation of said Swift, after he got to the bed-room door, went into his bed-room, where he was in bed, and there had conversation with said Swift about some business with him.

The counsel for the plaintiff requested the court in writing to instruct the jury, as will sufficiently appear from the arguments of counsel, in several particulars.

The court,—PIERPOINT, J., presiding,—declined to instruct the jury as requested, but instructed the jury, that as the defendant admitted that he received the money of the plaintiff, and did not re-deliver it when it was demanded, alleging that it had been stolen from him, the plaintiff was entitled to recover the $4,000 and interest, unless the jury should find from the evidence that the money was stolen from the defendant as he alleged. But if the jury should find, that the money was so stolen, then the

McDaniels *v.* Robinson.

plaintiff would not be entitled to recover, unless the defendant or his servants had neglected to use that care and diligence in the care and keeping of the money which the law required. If the jury find that the defendant was an innkeeper, (which is admitted by defendant,) and the plaintiff was a guest at the defendant's inn at the time the money was stolen, and the loss is *prima facie* through the negligence of the defendant or his servants, and the burden of the proof is on the defendant to prove it was not so lost, the plaintiff is entitled to recover, unless the defendant has proved that the money was stolen without any negligence of his or his servants.

The court also instructed the jury, that if the plaintiff continued the guest of the defendant, from the 26th day of February, to the 6th day of March, or if the relation had ceased, and had afterwards been renewed, and continued to exist at the time the money was stolen, the defendant would be liable in this action, unless he proved that the money was stolen without any negligence whatever of his or his servants. But if the jury find that the plaintiff, and his associate, Thomas C. Robinson, on Friday or Saturday previous to the 5th of March, departed from defendant's house, and went to the house of Thomas McDaniels, and caused the removal of all his effects, as specified in his letter of March 2d, and continued to abide principally at Thomas McDaniels', the plaintiff only taking occasional meals, or lodging a single night at the defendant's house, until the 5th of March, and then the plaintiff delivered to the defendant the package of money, and requested him to keep the same until the next day, and then deliver it to Truman Huling, if he did not himself call for it before the time of the departure of the stage for Troy, and told the defendant he was going to Thomas McDaniels', and had business to transact with him, and should not be at defendant's house again until the next day, and thereupon plaintiff left the defendant's house, and did not return there, until the defendant went to see him the next day; the defendant did not, by receiving the money, incur the peculiar liability of an innkeeper, for the loss of the money, although the plaintiff's horse, wagon, harness and buffalo robe remained at the defendant's barn, connected with his inn.

The court further instructed the jury, that if the defendant re-

ceived the package of money of the plaintiff, to be by him gratui-
tously kept until the next day, and then to be re-delivered to the
plaintiff, or to Mr. Huling, and the same was stolen from the de-
fendant, the plaintiff not being a guest at the inn, the plaintiff is
not entitled to recover, unless the defendant was grossly negligent
and careless in the keeping and management of the package, and
thereby occasioned its loss, (explaining to the jury what would
constitute gross negligence, to which there was no exception,) but
if the loss was thus occasioned, the plaintiff was entitled to re-
cover.

That the evidence relative to the undertaking of the defendant
to carry the package of money to Dr. Swift, did not prove such a
contract, as entitled the plaintiff to recover on either of the two
last counts in the declaration.

The plaintiff was sworn and examined as a witness, and his
counsel offered to prove by him, that when he delivered the money
to the defendant on the 5th of March, and when he left said inn,
it was his intention to return thereto the next morning, and
although the defendant went to the house of the plaintiff's broth-
er at an early hour the next morning, and informed the plain-
tiff that the money was lost, that the plaintiff would have gone
back to said inn, on said morning, if such loss had not occurred.

This offer was objected to by the counsel of the defendant and
was excluded by the court.

The court, in relation to what would constitute a guest, instruct-
ed the jury, that it was not necessary that the guest should contin-
ually remain in the inn, lodge there every night, or take all his
meals there, but the relation of host and guest would continue
during such temporary absence, if the effects of the guest brought
by him into the inn remained there and he continued to make the
inn his principal abiding place, as the inn of a guest, and the inn-
keeper would be liable as such for all the effects of the guest by
him brought or deposited in said inn. That the occasional visits
and taking meals at an inn would not necessarily constitute the
person making such visits the continued guest in the inn. A man
may lodge, take his breakfast and supper at one inn, and take his
dinner at another; while abiding in the inn for the purpose of tak-
ing his dinner, he is a guest in that inn, and the keeper is liable

for his effects brought in with him, but the relation ceases when he leaves the inn.

The jury returned a verdict for defendant.

Exceptions by plaintiff.

*D. Kellogg* and *E. Edgerton* for plaintiff.

I. The defendant was an innkeeper at the time the money, (which was subsequently lost,) was committed to his keeping, this was not contradicted but admitted on trial.

II. The plaintiff was the guest of the inn from the evening of the 26th of February, until the evening of the 6th of March following, the plaintiff during all that time having his horse, wagon, harness, and buffalo robe at the inn, and his own absence being for temporary purposes, with the intention of returning until his business was completed. 10 Petersdorff. *York* v. *Grindstone*, 1 Salkeld 388. *Jelly* v. *Clark*, Cro. Jac. 188. 9 Pick. 280. *Peet* v. *McGraw*, 25 Wend. 653. Story on Bailments 477. 21 Wend. 282. Chit. on Cont. 477, notes.

III. And if at any time during that period, the relation of innkeeper and guest was suspended, (which we do not admit,) it was renewed on the morning of the 4th of March, and continued until after the money was delivered into the keeping of the defendant, as such innkeeper.

IV. The plaintiff, when he left on the evening of the 5th of March, did so for the purpose of transacting some business with his brother, and so informed the defendant, and at the same time intimated to him that he should return next morning; no doubt was expressed or entertained by either of the parties as to the *fact of returning;* the only contingency related to the time of the return, whether before or after the departure of the stage for Troy.

V. Whether the plaintiff, when he left on the evening of the 5th of March, did intend to return was a question of fact for the jury, and the court erred in not submitting it to the jury as requested, and also, in excluding the evidence offered by the plaintiff on that point. Story on Bailments, § 477.

VI. The court erred in limiting their instructions to the jury, that if the money was stolen *without the fault of the defendant or his servants*, the defendant was not liable. 1. The defendant was innkeeper, was an insurer of the property, and he could exoner-

ate himself from liability only by showing that the loss was from inevitable casualty or superior force. Story on Bail. § 470 & 482. Jones on Bail. 108–109. 21 Wend. 285. *Mason* v. *Thompson*, 9 Pick. 280. *Grinnell* v. *Cook*, 3 Hill 488. *Clute* v. *Wiggins*, 14 Johns. 175. 2 Kent's Com. 592 and note.

2. At all events, the defendant must show that the loss was not occasioned by his guests or servants or inmates of the inn. *Merritt* v. *Claghorn*, 23 Vt. 177.

VII. The court erred in directing the jury, that the defendant was not liable upon his promise to carry the money to Dr. Swift, to be kept through the night. 1. The promise was made upon sufficient consideration, the money being left in his hands for the purpose of being carried there. 2. The defendant entered upon the execution of the bailment. Story on Bailments § 137, 171.

VIII. The court erred in instructing the jury, that the defendant was not liable upon the count for money had and received. The defendant having carried the money to Dr. Swift's house in part performance of the bailment, and then having carried it away, without any sufficient reason for not leaving it there as he had agreed to do, his conduct was a deviation from the purpose of the bailment, a misuser, a wrongful conversion. Story on Bailments § 509, 188, 190.

*O. L. Shafter* and *D. Roberts* for defendant.

Under instructions free from criticism, the jury have found, 1. That the money was stolen from the defendant *as he alleged*, i. e. by a burglarious entry from without the house.

2. That the loss was not occasioned by gross neglect of the defendant, in the keeping and management of the money.

An innkeeper's liability for the loss of his guest's goods rests upon the compensation he receives for the keeping of them. 2 Saund. Pl. Ev. 217. 1 Swift's Dig. 550.

As to dead property this compensation usually exists in the innkeeper's profit upon the personal entertainment of the guest, the entertainment being the principal contract, and the custody of the goods but accessory. 1 Parson's Cont. 627, 629. 1 Bouvier's Ins. 409.

As to live property, as the horse, the compensation may lie in the profit on the keeping of the horse. *York* v. *Greenough*, 2 Ld.

Raym. 866. If we may extend this idea of compensation, lying in the profit from the keep of the horse, to the custody of the accompaniments of the horse, as the wagon &c., as was done in *Mason* v. *Thompson*, 9 Pick. 280, it seems absurd to extend it to the custody of articles connected with the person of the owner, as a bag of gold.

In that case, the principal contract was the keeping of the horse. As to the bag of gold, the principal contract would be the entertainment of the guest.

The better opinion is, that to make the innkeeper liable for the loss of the horse even, the owner must be personally a guest when the horse is left.

BRONSON, J. in *Grinell* v. *Cook*, 3 Hill 485, denying *Mason* v. *Thompson*, and endorsing Ld. Holt's opinion in *York* v. *Greenough*. *Binns* v. *Pigols*, 9 C. & P. 208. *Smith* v. *Dearborn*, C. C. B. 132. 1 Parson's Cont. 639, 632. 2 Saund. Pl. & Ev. 216. *Thickstun* v. *Howard*, 8 Blackf. 535.

We may admit the liability of the defendant for the loss of this horse, and perhaps his accompaniments occuring even after the personal relations of the plaintiff, as guest of the defendant had terminated. They having been left while the plaintiff was a guest, and a profit accuring to the defendant.

As to these, we might call the plaintiff a guest, still. But this is rather by construction and a figure of speech, as it is said in *Gelly* v. *Clark*, Cro. J. 188, he is reported a guest for that purpose.

For what is a guest, " A lodger, a stranger in an inn." See Jacobs' Law Dict. Tit. *Guest*.

It seems absurd to say, that the horse at the stable makes the owner a guest in the inn.

As to the intent of the plaintiff to return to the defendant's house. The intent, if of any importance, should be more than simply to return to the house; it must be to return to it *as his inn causa hospitandi*.

If the temporary guestship of the 5th of March could be protracted, during absence, by an intent to return, it could only be by an intent to return *as guest*.

The innkeeper must receive the goods in his character of innkeeper, or he is not liable as such. 3. Bac. Ab. Tit. *Inns*, c 5, p.

McDaniels *v.* Robinson.

666. 1 Cow. Dig. 298. *Williams* v. *Gesse,* 3 Bing. (N. C.) 849. *Snider* v. *Geiss,* 1 Yeates 34. 1 Smith's Lead. Cas. 52, 104.

The test is,—Is he bound to receive the goods? 1 Parson's Cont. 629, 630. *Grinnell* v. *Cook,* 3 Hill 488.

The evidence upon both sides is consistent only with the proposition, that the defendant received the money as an ordinary bailee. Thus it was delivered to him, not because the plaintiff was staying at the inn as a guest, but because he was about to leave the inn, and so cease to be a guest.

The direction almost simultaneous with the delivery, to take the money to Swift's, thus placing it *extra hospitium,* negatives the idea of the delivery being with the defendant in the capacity of innkeeper.

Again, the defendant was not bound to receive the money upon the ground of want of compensation; and therefore having received it, it was in another capacity than as innkeeper. 1 Parson's Cont. 629–630.

The 3d request of plaintiff's counsel to the court to charge the jury, left out the fact that plaintiff had broken up his first relation with the defendant, and that his principal abiding place was then at his brother's.

This was an important fact as influencing the determination of the question, whether the plaintiff was the defendant's guest on the night of the 5th of March. The question is, where was the plaintiff's inn, abiding place, home? Whose guest was he at supper, through the night, and at breakfast?

*Guest*—" A lodger, or stranger in an inn. Jac. Law Dic. Tit. *guest.*

" A person who stays there under an express or implied agreement to be supplied with his personal wants." 1 Bouvier's Ins. 409.

" A stranger; one who comes from a distance and takes his lodgings at a place." Webster's Dictionary.

" It is the lodging of the man at the inn that makes him a guest." See Ld. Holt in *York* v. *Greenough.*

The intention to return the next day was in no other way made known, than by the plaintiff's saying that he should not return *until* the next day. If we may infer from this, that the plaintiff would return the next day, we may as fairly infer, that he would

McDaniels *v.* Robinson.

not return until after the money had been sent to Troy. But whatever may have been the plaintiff's intention, or however expressed, "yet he was at his liberty, and was not a guest during the time," of the absence. *Gelley* v. *Clark,* Cro. J. 188.

A burglary is regarded as a superior force, and occuring without fault of the innkeeper, is irresistable force. "Liability does not extend to loss occasioned by irresistable casuality, or superior force as robbery." 2 Kent's Com. 593. 1 Blackstone's Com. 430. 2 Saund. Pl. & Ev. 217.

The charge of the court laid down the correct rule, as to the liability of the defendant—treating it as a question of negligence, not insurance. *Merritt* v. *Claghorn;* 23 Vt. 177. 1 Rol. Ab. 35, 47. *Dickerson* v. *Rogers,* 4 Humph. 179. 5 Blackf. 323. *Towson* v. *The Havre de Grace Bank,* 6 Har. & Johnson 47.

The charge of the court, in relation to the delivery of the money to Dr. Swift, was correct.

1. There was no evidence from which the jury could infer a consideration, for the agreement to take the money to Swift. If anything more than a direction as to the mode of keeping the money, it was but a gratuitous undertaking.

2. As such the non-delivery to Swift was but a nonfeasance for which no action would lie.

3. No consideration for this undertaking lay in the delivery and acceptance of the money, for it was delivered and accepted for another purpose. 1 Parson's Cont. 581.

4. There was no evidence, that Swift was ready and willing to receive and keep the money; his present supposition as to what he would have done *if &c.,* does not tend to prove that averment.

Again—If taking the money from under the stove and placing it directly under the bed, would not be a conversion, it is difficult to see how taking it from under the stove, carrying it across the street, and then putting it under the bed, would be any more a conversion. 5. This bag of gold tied up being a specific thing, a count for money had and received cannot be sustained, without proof of an actual appropriation of it as money. *Danforth* v. *Grant,* 14 Vt. 283.

*As to the exclusion of the evidence—*

1. The mode of proof was improper, the intent is rather an inference from facts proved, than a question of actual mental action.

XXVI    22

When the witness says, "I should have returned," &c., he is but expressing his present opinion, that his circumstances and intentions were then such, as to have led to his return. This is not fact, but opinion.

2. The intent was an undeclared intent, it was not an intent to return to defendant's house as a guest. The plaintiff had no inn there to return to, the defendant could not have received him as a guest without violating the law. *Non constat,* that the defendant would have received him; for he was bound by no obligation to the plaintiff to continue in violation of the law. 2 Kent's Com. 1st Ed. 462.

The opinion of the court was delivered by

REDFIELD, CH. J. The first question arising in this case is in regard to the plaintiff being a guest of defendant, at the time he deposited the $4,000 in gold with him to keep. The plaintiff's testimony tended to show he came to Bennington, on business, on the 26th of February, and put his horse into defendant's stable, he being a common innkeeper, leaving his wagon, harness, and buffalo skins in defendant's custody, where they remained without interruption till the 6th of March, the money being lost on the night of the 5th of March. The plaintiff took a room, became a guest in the strictest sense, and continued to lodge and board constantly at defendant's inn till Saturday the 1st day of March, after breakfast, when he went to his brother's in the vicinity, and remained over Sunday. On Monday he returned to the inn, and dined there, occupying the same room as before. Monday night he took tea, lodged with his brother, and took breakfast the next morning. The plaintiff then returned to defendant's inn, occupying the same room continuously, night and day, till Wednesday evening, about half past five o'clock. In the course of the day, Wednesday, he received the $4,000 in gold, being 200 double eagles, and delivered them to the defendant, in a shot-bag, in plaintiff's room. Defendant said, at the time of receiving the money, he did not like to be accountable for so much money. Thereupon plaintiff took it, wrapped it in a newspaper and handed it back to defendant, saying, there was no danger, and requesting him at the time to put it in the tick of the straw bed in which he, defendant slept, and there to keep it through the night, and not to let any

one know it, plaintiff saying he was going to his brother's, and should not be back until the next morning, when he did, in fact, return, and remained in defendant's inn through the day, taking dinner and tea. Nothing was said about plaintiff giving up the room, which the plaintiff continued to occupy every day, more or less, during the whole time, except Sunday, and had fires built by defendant. Just before plaintiff left defendant's inn, on the evening of the 5th of March, and after he had delivered the money to defendant, and told him to keep it, he called defendant, and told him his house was more exposed to fire than that of Dr. Swift's which was near. "He wished him to take the money over to Dr. Swift, and let him keep it through the night," which defendant promised to do "right away," or "presently." The money was not then in the immediate view of the parties, but in an adjoining room, some ten feet distant, where defendant had placed it. About nine o'clock in the evening, defendant took the money to Dr. Swift's house, but seeing no signs of the Doctor being up, or at home, and supposing he might have been called away, carried the money back to his own house. There was no evidence tending to show that defendant or plaintiff expected anything was to be paid for keeping the money, or carrying it to Dr. S. The defendant's testimony tended to show that plaintiff stayed less at defendant's house than above stated, and that on Sunday, he wrote defendant to bring his clothes and papers at the room, the next morning, to plaintiff's brother, which defendant did accordingly. The defendant notified the plaintiff, early on the morning of the 6th, of the loss of the money, and that it had been stolen, and gave evidence, tending to show that it was lost by a burglarious entry of the house from without, but what such evidence was, is not stated. There were a number of boarders and lodgers in the defendant's house at the time. Nothing is stated in the case, to show that any one in particular knew the time or the manner of the money being taken, or that any one heard any disturbance about the house during the night, or that any marks of violence were found upon the house. This is a brief statement of the leading facts; others will appear more fully in the course of the opinion.

I. In regard to the question, how far the plaintiff can be regarded as a guest of defendant, at the time the money was put into the defendant's hands, and up to the time of the loss, the cases are not

BENNINGTON COUNTY.

McDaniels *v.* Robinson.

very clear. The case of *York* v. *Grindstone*, 1 Salkeld. 388, has been understood by most of the elementary writers, as deciding, by a divided court, that one by leaving his horse at an inn becomes a guest. And such is virtually this decision, inasmuch as defendant's lien as innkeeper is recognized, in regard to a horse left at his stable by a traveler who did not himself put up at the inn. And such lien does not exist as to horses put at the stable of an innkeeper, even by those who are not travelers and guests. And so this case is perhaps justly regarded, by judges and elementary writers, as settling the point that one becomes a guest, as to all the property which the innkeeper consents to take into his keeping, by leaving his horse, from which profit is derived, although the same relation is not created by leaving a dead thing, as a trunk from which no profit arises, as is intimated, although not decided, in *Gelley* v. *Clark*, Cro. Jac. 188. But that point has since been regarded as settled by this case, although the case was adjourned for advisement, "being a new case." In 1 Smith's Lead. Cases 50, in the note of that learned and accurate writer to Calye's case, (8 Coke's Rep. 32,) it is said: "If a traveler leaves his horse at an inn, and lodge elsewhere, he is, for the purpose of this rule, to be deemed a guest." And 3 Bac. Ab. Tit. Inns and Innkeepers, c. 5, p. 666, takes the same view of the law, referring to this and other cases. And Mr. Chitty, in his treatise upon contracts, p. 476, says: " A person may be a guest, though he merely leave a horse at the inn, and himself lodge elsewhere." And I cannot find that the doctrine of this case of *York* v. *Grindstone*, to the extent above laid down, has ever been questioned in England. It is equally well settled, too, that one becomes a guest by going to an inn for mere temporary refreshment, either food or drink. (*Bennet* v. *Mellor*, 5 T. R. 273.) This last case is certainly going the full length of the most temporary stay, and must still be regarded as altogether sound. So too, the length of time one remains at the inn is not important, if he remain there in the transitory character of a guest. (3 Bac. Ab. *ubi supra*, Chit. on contracts 476, and notes.) It is unquestionable that an innkeeper may receive goods as a common bailee, to keep with or without reward, and thus stipulate to be excused from the increased responsibility of an innkeeper, or he may consent to assume this increased responsibility toward one who is not strictly a guest, for things deposited with him.

( *Williams* v. *Green*, 3 Eng. Com. Law Rep. 353.) In other words he may increase or restrict his general responsibility by special contract, as is held in regard to common carriers. (*Farmers' and M. Bank* v. *Ch. Transportation Co.*, 23 Vt. 186.) But a mere notice to guests, that the innkeeper will not hold himself responsible for goods, unless expressly assented to by guests, will probably not have this effect, except, perhaps under special circumstances, as in regard to being notified of extraordinary amounts of money, and other valuable goods, so that they may be kept with proportionate care, as is held in regard to carriers, in the last case, and for similar reasons. The same rule in regard to what is necessary to create the relation of guest, has been adopted in some well considered cases in this country : *Mason* v. *Thompson*, 9 Pick. 280, where it is held that an innkeeper becomes liable for the safe keeping and return of a chaise and harness, left in his custody by a traveler who put his horse at the inn, and himself put up with a friend. And to the extent of the horse and equipage certainly, we think, it must be regarded as fully settled by authority, both in England and this country, that the innkeeper is liable as such where the horse of a traveler is put at the inn, although the owner or traveler himself puts up at another place. (*Peet* v. *McGraw*, 25 Wendell 653.) And the cases of *Grinnell* v. *Cook*, 3 Hill 486 ; *Thickstun* v. *Howard*, 8 Black. 535 ; *Hickman* v. *Thomas*, 16 Alabama 666, which are often referred to as denying that the relation of guest is thereby created, so as to impose the increased responsibility of innkeeper, certainly do not decide that point, since it was not involved in the cases, although such an opinion is there intimated. All that is there decided is, that the horse of one, not a traveler, put at an inn, created only the ordinary liability of a bailee, for compensation, on the part of the innkeeper. And this is altogether consistent with the cases of *Mason* v. *Thompson*, and *York* v. *Grindstone*.

It is observable that no case has yet arisen where a traveler, putting his horse at an inn, has left other goods than such as pertain to the horse and carriage. But upon principle, if the relation of guest is thereby created, and the host consents to take other portions of the traveler's necessary luggage, like his overcoat, which it is most common to leave with the horse, but usually within the inn, or even one's trunk or money, if put into the custody of the

proper servant or agent, at the bar, while the innkeeper retains the horse, from which he derives profit, it is difficult to see why he should not be held liable to the full extent, as innkeeper, for all that he thus accepts.   And many judges thus lay down the rule, which seems but a fair corollary from the cases.   But as no case has gone that length, and this case does not now seem to involve that naked point, we do not intend here to decide it.

This case, on the evidence put in by the plaintiff, seems to present, in the first instance, the relation of guest, in the strictest sense.   And we do not think it necessary to continue that relation, that the plaintiff should have continued his dwelling, for the time even, within the inn.   The relation of guest was clearly created by putting the horse at the inn, and it was undeniably extended to all the plaintiff's goods left at the inn by his taking a room, and taking some of his meals at the inn, and lodging there a portion of the time.   This matter seems to be perfectly settled by the custom in the cities.   It is there considered that taking a room is the decisive act to create the relation.   That being done, the guest is charged, as such, for his meals and lodging, whether he take them at the inn or with his friends, as any one may know who has had experience in such matters.   And this seems to us well enough. One in so extensive a city as New York, might find it convenient to have a room for his parcels, and to take his dinner at a downtown hotel, while he might choose to have his lodging, and most of his personal apparel and baggage at an up-town house.   And it would certainly be unreasonable, if one chose to be at this expense that he should not have the same security for his goods left at the one hotel as the other.   Or if one took lodgings at a hotel, and should subsequently find it more comfortable to lodge with a friend, and for any reason should not choose at once to give up his room, and break up his connection with the hotel, it would certainly sound very strange that he should not have the same security for his goods as if he made the hotel his constant abiding-place for the time.   He would certainly be bound, ordinarily, to pay till he gave up his room, and in all the books, pay, or the right to charge, is made the criterion of the innkeeper's liability.   But after one has given up his room, and closed his connection with the hotel, then, indeed, it is generally understood, and no doubt correctly, that for any baggage left at the inn the landlord is only liable as

McDaniels *v.* Robinson.

a common bailee. And it was toward this point that the defendant's testimony was addressed, and which, if made out, would probably have been sufficient to excuse the defendant as to his increased responsibility for the personal goods of the plaintiff; certainly unless this responsibility can be predicated merely of the horse remaining at the inn, which has not yet been regarded as settled. This is not the view taken of the law upon this point by the court below, and in that there was error.

In the view we here take of the case, the testimony of the plaintiff to his purpose of returning to defendant's house on the morning of the 6th was important, and should have been received. The parties being made witnesses, as the law now stands, are witnesses to every point material to the determination of the case. And the plaintiff saying to defendant, when he left the evening before, he should not return till morning, was equivalent to saying he should then return, and his *bona fide* purpose of then returning seems to be very significant upon the point of the continuance of the relation of guest, so far as it depended upon the intention and expectation of the plaintiff.

II. In regard to the general liability of an innkeeper, it is surprising that the law should still be so indeterminate. But the cases are fewer and less decisive upon this important subject than might have been expected. Even the absurd dictum in *Newton* v. *Trigg*, 1 Shower's 269, where Eyres, J., says, " *They* (innkeepers) *may detain the person of the guest who eats*," has been constantly quoted to establish the existence of such a right in the landlord, and without much examination, (although the point decided in the case is, whether an innkeeper may become a bankrupt,) until the comparatively recent case of *Sunbolf* v. *Alford*, 3 M. & W. 247, where Lord Abinger says, "I would be sorry to have it thought I entertain any doubt in this case, or required any authority to support the judgment I propose to give,"—that no such right to detain the person of the guest can be for a moment tolerated in a free country. So, too, we find numerous creditable judges, and some decisions, carrying the liability of an innkeeper to the full extent of a common carrier, and thus making him an insurer against all losses not caused by the act of God or the public enemy. But such is clearly not the general course of the decisions in Westminster Hall, and that extreme responsibility was

expressly repudiated by this court. (*Merritt* v. *Claghorn*, 23 Vt. 177.)

It is there held that an innkeeper is not liable for loss of goods of the guest by fire from without, the probable act of an incendiary, and without any fault or negligence on his part, or on the part of any inmate of the house. But we have never intimated that we were prepared to put the liability of an innkeeper upon the same ground as that of other bailees. On the contrary, we regard it as well settled that the liability of an innkeeper is more severe than that of any other bailee, with the single exception of common carriers. In *Richmond* v. *Smith*, 8 B. & C. 9, (15 Eng. Com. Law R. 144,) Lord Tenterden, says, in regard to goods stolen from the custody of an innkeeper, "The situation of an innkeeper is precisely analogous to that of a carrier." This may be too strongly expressed, if applied to all cases of goods taken from the custody of an innkeeper. For it may be done by superior force, and without his fault, and still not the force of a public enemy, which is necessary to be shown to excuse a carrier. But in regard to goods stolen from the custody of an innkeeper, and no evidence to show how it was done, or by whom, the liability is the same as that of the carrier. The innkeeper is bound to keep his house safe from the intrusion of thieves, day and night, and if they are allowed to gain access to the house, and especially without the use of such force as will show its marks upon the house, it is fairly presumable that it was either by the negligence or connivance of the host, and such is the judgment of the law thereon.

Perhaps the rule of law as applicable to such a case is better expressed by Mr. Justice BAILEY, in this same cause: "It appears to me that an innkeeper's liability very closely resembles that of a carrier. He is *prima facie* liable for any loss not occasioned by the act of God, or the king's enemies." And Mr. Justice STORY, lays down the rule in regard to this liability as correctly as it can well be stated, in his work on Bailments, § 472: "But innkeepers are not responsible to the same extent as common carriers. The loss of goods while at an inn will be presumptive evidence of negligence on the part of the innkeeper or his domestics. But he may, if he can, repel the presumption, and show that there has been no negligence whatever, or that the loss has been occasioned

McDaniels *v.* Robinson.

by inevitable casuality or superior force." And in the case of *Dawson* v. *Chamney,* 5 Ad. & Ellis, N. S. 164, (48 Eng. Com. Law R. 164,) Queen's Bench, 1843, Lord DENMAN, in giving judgment, quotes these words of Mr. J. STORY with approbation, and substantially bases the judgment of the court upon them. Pothier's exposition of the civil law liability of this class of bailees is much the same. The Institutes of Justinian, lib. iv., tit. 6 § 3, thus lay down the rule : " *Item exercitor navis, aut cauponœ, aut staubli, de damno, aut furto, quod in navi, in caupona aut stabulo, factum erit, quasi maleficio teneri videtur.*" The innkeeper, it seems, was thus made liable for all *damage* or *theft,* the same as if it arose from his positive wrong. If it happened, it was in law regarded as his wrong, *quasi ex maleficio teneri videtur.* And the perpetual edict of the praetor, which has formed the basis of the commentaries of most of the civil law writers upon this subject, is little more than an amplification of the text of the Institutes. The code Napoleon, book iii., tit. 2 § 5, 1953, is scarcely more than a translation of the Institutes : "They (innkeepers) are responsible for the stealing or damage of the property of the traveler, whether the robbery were committed or the damage were caused by the domestics and officers of the establishment or by strangers going and coming within the inn : 1954, *ib.* : "They are not responsible for robberies committed with armed force, or any other superior force." These two maxims seem to embody the substance of our law upon the subject at the present time; in confirmation of which we would further refer to the following English and American cases : *Clute* v. *Wiggins,* 14 Johns. 475. In this case, a wagon loaded with bags of grain was put in a wagon house, which was broken open ; " from which," say the court, " it is to be inferred that the building was close, and the doors fastened in such a manner as to promise security." Still the defendant was held liable. The innkeeper is liable for goods stolen from any part of his house, unless he expressly limit his responsibility, and this is assented to by the guest. (*Richmond* v. *Smith, supra.*) He is responsible for money belonging to his guests. (*Kent* v. *Suchard,* 2 Barn. & Ad. 803—22 E. C. L. R. 186.) And he is responsible for the acts of every one within his house, unless introduced by the guest, as all the cases agree. (*Towson* v. *The Havre de Grace Bank,* 6 Har. & Johnson 47.)

It may be important to consider how far the defendant is here liable for a burglarious entry of his house from without, which the case says he claimed, and gave testimony tending to prove. The detail of the evidence not being given, it is impossible to determine whether the burglary was of a character, if proved, which should exonerate the defendant; for, although the authorities are not decisive, or altogether coincident upon this subject, it must be obvious to all that an ordinary burglary, such as might have been expected to happen, upon proper temptation, should have been provided against by the host, and the omission to do so is itself negligence. And the recent decisions seem rather to incline to the view that the host is liable for all losses of the goods of his guest, even by burglary or robbery, unless produced absolutely by superior force, the *vis major* of the schools. Ch. Kent, in Com. 2 vol., page 759, (593,) in William Kent's ed., seems to incline to this view as the fair result of *Mason* v. *Thompson* and *Richmond* v. *Smith.* Mr. Jus. STORY, in the later edition of his Bailments, seems to incline to the same view, page 309, 2d ed. And ordinarily an intrusion into a house by robbers from without, or burglars, must be attended with force and fracture, and more or less noise and alarm, no doubt; and in this peaceful portion of the country to have happened, and leave no vestige, would be fairly calculated to excite suspicion against the host, of negligence at least. And where marks of the intrusion are found, so as to leave no doubt of the mode of the loss, it must still be a question how far the house was properly fastened. And following the general rule of diligence, on the part of innkeepers, of "uncommon care," as laid down by Lord HOLT, or, as some of the books have it, "the extremest care," it would certainly be incumbent upon them so to fasten the inn itself, where their guests lodge, that it would not be liable to be broken by common force or art. But I can comprehend that money might be lost by a burglarious entry, under peculiar circumstances, without affording any just ground of imputing even negligence to the innkeeper; and in such a case notwithstanding some dicta to the contrary, I should myself incline to the opinion that the innkeeper is not upon principle, holden.

But I do not think a jury could be allowed to exonerate an innkeeper from the loss of the goods of his guest upon presumption merely, or indeed without proof of some of the circumstances or-

dinarily attending the breaking of a house securely fastened. It is the distinctive peculiarity of this species of bailment that the host is *prima facie* holden for the restitution of the goods of his guests. And to make this rule of any practical utility, it is indispensable to hold the host to proof of the mode in which the goods were taken from him, and that it was without any fault or negligence on his part.

And if his house is properly secured, and the goods properly guarded, as such an amount of money would be likely to be by the owner, it is fairly supposable that some trace of its departure may ordinarily be found. And when a case occurs that possibly or probably professional robbers may have succeeded in eloining money or other goods without leaving foot-prints, it is better that the innkeeper should be held liable until he can prove the mode of the loss, than that so beneficial a rule of law, and one so indispensable to the quiet and comfort of travelers, should be virtually demolished.

And with every disposition to take a reasonably favorable view of the case for the defendant, it seems to us that if he really held the money, as innkeeper at the time, he should have shown something more definite as to the mode of the loss than any thing detailed in the bill of exceptions, to excuse himself from restoring it. On the bill of exceptions, it seems to be the common case of goods left at an inn and lost by theft of some unknown person, which is the common case of such loss. The manner of the loss should be stated, if known, in order to raise the proper question of law, as it regards this portion of the case, the law reversing its ordinary presumption of innocence in this case, and presuming the liability in the first instance; for if the fact of loss may be left to a jury, together with the ordinary negative evidence which may be supposed to attend such a case, as a sufficient ground upon which to excuse the innkeeper, the practical benefit of the rule of his presumptive liability is at once abandoned. A presumption which may be encountered and overcome by a counter presumption, without proof, is of no avail in its practical application to the business of life. It thus becomes neither an *absolute* or *probable* presumption, but a mere conjecture, good enough till some counter conjecture springs up, which is not what is meant, in law, by a " presumptive liability." It may more properly be likened to the

presumptive bar of a debt, from lapse of time, or the legal bar of the statute of limitations, both of which are removed by a new promise, or the payment of interest, or part of the debt; but it cannot be left to a jury to raise such opposite evidence by mere conjecture or counter presumption. So, too, in the case of an innkeeper; the mere fact of the loss of the goods, without any connivance or consent on his part, and in the common course of his business, with his doors fastened in the ordinary mode, is no sufficient ground from which to allow a jury to find no negligence on his part; for the law has attached an opposite, and to some extent an artificial presumption to these same facts; i. e., a presumption of negligence. And although this is not an absolute and conclusive presumption, like some in the law, it is nevertheless one of those presumptions which, to be of any avail practically, must be allowed to stand till encountered by some tangible and reasonable proof to the contrary, either positive or circumstantial. Le BLANC, J., says, in *Burges* v. *Clement*, 4 M. & S. 306, " Negligence will be imputed to him (the innkeeper) where the loss is not to be ascribed to any other *known* cause." This seems to us the true rule; and when some other cause is known and presented, it may then become a question whether it is sufficient in law. But to say that it was " from a burglarious entry from without," and that proof was given tending to show that, is not sufficient, inasmuch as the majority of such burglaries may be supposed fairly to result from negligence on the part of the innkeeper, or his servants, or the inmates of the house; and in such case the innkeeper is liable.

III. In regard to the agreement to deliver the money to Dr. Swift, it may be viewed in two lights: 1st. Was the promise upon sufficient consideration? Of this we entertain no doubt. The delivery and acceptance of the goods are a sufficient consideration for any undertaking in regard to them, even where the service is merely gratuitous, as was held in *Coggs* v. *Barnard*, Ld. Raymond, 909, Com. 143, Salk. 26, and which has not been questioned since; and the goods being, at the time of the undertaking, in the power of the parties, is the same thing, since it is presumable that but for the promise the guest would have reclaimed his goods; he was therefore, ·by the new promise, induced to forego an advantage, which is a sufficient consideration. 2nd. Was this promise reasonably performed? Did the defendant do all he ought reasonably

to have been expected to do in its performance? If so, he afterward merely retained the goods as a depositary, without pay, and would, as the court below charged, be liable only for gross neglect. It ought, perhaps, in such a case, to be brought to the mind of a jury the question of neglect or diligence is very much affected by the quality of the business. A man is expected to use care and diligence proportioned to the importance and difficulty of the business intrusted to him; and from the great value of so large a sum of money, the ferocity of men's appetites for money, and the consequent certainty of it being stolen, if exposed, one who should take the same care of such a bag of gold, which he might fairly be expected to, of other goods, might still be guilty of gross neglect as to this, and not as to other things kept with the same diligence. If the defendant failed reasonably to perform his contract in this respect, he ought probably to be held liable for the consequent loss to the plaintiff.

IV. If the defendant held the money, as innkeeper, and made this contract upon sufficient consideration to deliver to Dr. Swift, the inquiry will arise, what effect this contract will have upon his former obligation. That will depend upon the probable intent of the parties, which may ordinarily be gathered from the terms of the contract and attending circumstances. If the new contract was intended to supersede the former one, and come in its place, so as to have the defendant hold the money at once, in a new relation, then, of course, the former one will cease. As, for instance, if the plaintiff had consented to have defendant loan the money to some one, or had employed him to carry the money to Troy, or to New York, and he had entered upon this duty in either case, and had lost the money upon the road, or before it was actually loaned, or if in any other way the new contract was inconsistent with the continuance of the former one, the old contract is released by entering into the new, although of the same grade, and not creating a technical merger.

But when the new contract is consistent with the continuance of the former one, and only provides a new mode of *discharging* the former one, it produces no effect upon it unless or until performed; and this latter seems to have been the probable purpose of the parties in this case. It is hardly supposable that if defendant held the money, as innkeeper, the parties could have expected his

McDaniels *v.* Robinson.

duty, as such to be affected until he performed the new contract, or, at least, entered upon its performance. And after the failure to perform by accident and without fault, it would be reasonable, perhaps, to conclude the parties expected the defendant's obligation would remain the same it was at the time this new contract was entered into, unless there was something to show that the defendant declined keeping the money, as innkeeper, which he might do if he preferred to risk the consequences of such refusal, rather than to assume the responsibility ; and this new contract was entered into to induce the defendant to consent to keep the money for that purpose ; i. e., the purpose of the new contract. In that case it would seem reasonable if the defendant failed to perform the new contract, without his fault that the money would remain in his hands, only in the capacity of an ordinary bailee at most. But as new facts in a future trial may be evolved, we have not examined the cases at length upon this subject, especially as they have not been brought to our notice by counsel, but they will be found to sustain the general views above stated. Chitty on contracts, 111, 113, and notes and cases referred to.

Judgment reversed, and case remanded.

---

NOTE.—A more extended examination of the cases upon this subject, especially the American cases, develops nothing at variance, so far as the general course of decision is concerned, with the leading views put forth in the opinion in this case. And in some points where, at the time of writing the opinion, I was not aware of any express authority, I find almost precise coincidence and confirmation. The case of *Wintermute* v. *Clark*, (5 Sandford's Superior Court R. N. Y. city, 242,) seems a rather remarkable confirmation of our views upon the question of what is requisite to determine the relation of guest and host. OAKLEY, Ch. J., says, " It is plain that the liability of an innkeeper continues no longer than the continuance of the relation between him and the guest. That relation ceases *when the guest pays his bill, and leaves the house, with the declared intention of* NOT RETURNING. In this case the guest had carried his trunk to an inn, and taken a room, putting his trunk below, in some place pointed out by the servant as a safe and suitable place, and then had gone out to lodge with a friend. He returned in the morning and paid for the room, though somewhat objecting, and left the hotel. His trunk was never taken from the hotel by the guest. The testimony was conflicting whether it was lost before the guest settled his bill, or afterward, and Judge OAKLEY's remarks had reference to this point chiefly. This case had not come to my notice at the time of writing the opinion.

In a considerable number of the states, the courts have shown a disposition to put the liability of innkeepers upon the same high ground as that of common carriers. In Massachusetts the case of *Mason* v. *Thompson*, and some others per-

McDaniels *v.* Robinson.

haps, contain such intimations, and therein are doubtless at variance with the English decisions. But that the case of *Mason* v. *Thompson*, upon the main ground is not sound, I entertain no question, notwithstanding the sharp criticism of BRONSON, J., in *Grinnell* v. *Cook*, (3 Hill 486.) This last case is merely that of a townsman putting a horse or horses, at livery at an inn. And *Thickston* v. *Howard*, (3 Blackford 585,) is the of same character. And *Hickman* v. *Thomas*, (16 Alabama 666,) is the case of a stage proprietor putting his horses at an inn on his route, and the court held, and correctly, no doubt, that the inn-keeper had no lien upon the horses for their keep. These cases, with that of *Peet* v. *McGaw*, (25 Wendell 653,) which finally turned upon a question of plead-ing, are sometimes referred to as having shaken the case of *Mason* v. *Thompson*. But in the case of *Peet* v. *McGaw*, Ch. J. NELSON cites the case of *Mason* v. *Thompson*, as to the main question determined, with approbation. And although in some of the other cases, it seems to be questioned whether, if a *traveler* merely put his horse at an inn, and go somewhere else himself, the proper relation of guest is thereby created. Yet this question is in no sense involved in any of these cases; the plaintiffs in all the cases being *inhabitants*, and not *travelers*, could not become guests even if they resided personally at the inn, but would become *boarders*, and their horses, while they remained there, would be at livery merely. And upon the main point, whether, if a *traveler* leave his horse at an inn, and does not himself lodge at the inn, the innkeeper is liable as such, and for his keep holds a lien upon the animal, the decisions are all one way. It is not even a question-able point, in my judgment. We have nothing to oppose to that view but the dis-sent of Lord HOLT, in *York* v. *Grindstone*, the principle of the decision of the ma-jority of the court being firmly established in the English law ever since that date. That some of the dicta of WILDE, J., in the case of *Mason* v. *Thompson*, upon the general subject of the extent of an innkeeper's liability, require qualifi-cation, few thorough lawyers at the present day would be inclined to question. But similar dogmas are found in many of the English cases, from different emi-nent judges, and in a very large proportion of the American cases of that date, and immediately subsequent. And although it is some years since I have gone thor-oughly into the subject of the old English law, in regard to the comparative re-sponsibility of innkeepers and carriers, for goods intrusted to them, it is cer-tain there was an exact correspondence in the liability of these two class-es of bailees, in the civil law, and I am convinced by the form of the early writs against such bailees in the *Registrum Brevium*, that the primitive liability was precisely the same in England. But it is the responsibility of the innkeeper which has stood its ground, while that of common carriers has been constantly growing more and more stringent. But it is not needful to say more. The difference in the extent of responsibility in these two classes of bailees is now firmly estab-lished, and these *dicta* of judges and elementary writers, declaring them identi-cal, must be regarded as *apocryphal*, or at least behind the times. And this is all which can be fairly objected perhaps, to *Mason* v. *Thompson*.

The right of a guest to maintain his relation to an inn, notwithstanding tempo-rary absence, is very clearly recognized in *Grinnell* v. *Cook*, by BRONSON, J. "If a traveler leave his horse at an inn, and then go out to dine or lodge with a friend, or if he leave the inn and go to another town, intending to be absent two or three days, the rights and liabilities of the parties remain the same as if the traveler had not left the inn." In *Thickston* v. *Howard*, SMITH, J., speaking of the com-parative responsibility of carriers and innkeepers, says: "The rule of law is near-

---

McDaniels *v.* Robinson.

---

ly or quite as rigid in the one case as the other, although there may be some difference *in the cases excepted from its operation.*" In *Hill* v. *Owen,* (5 Blackford 323,) DEWEY, J., says: "That the loss of the goods of the guest from a common tavern, is *prima facie* evidence of negligence on the part of the keeper, and, unexplained, sufficient to render him liable." The case of *Towson* v. *The Havre de Grace Bank,* (Har. & Johns. 47,) puts the liability of the innkeeper on the ground of the agent of the bank being a guest, and paying, and though the bank paid nothing, and were not, in any sense, affected by the expenses of the agent, he acting only in the single transaction and that gratuitously, BUCHANAN, J., says: "Innkeepers are answerable by reason of the profits arising either from the keeping of the horses, etc., of their guests, or the keeping of the guests themselves, in the case of money, or other property, from the keeping of which no profit can arise." P. 52. In the case of *McDonald* v. *Egerton,* (5 Barb. Sup. Ct. 560,) the general views above are affirmed. MASON, J., in the language of the reporter's note, holds: "If a person, after becoming a guest at an inn, goes away for a brief period, leaving his property, intending still to return, he is to be considered as still continuing to be a guest, and, and if his property is lost during his absence the innkeeper is liable."

In the case of *Shaw* v. *Berry,* (31 Maine 478,) the rule laid down seems certainly more stringent than the cases will justify. TENNEY, J., says: "He (the host) is bound to keep the goods and chattels, so that they shall be actually safe, inevitable accidents, the acts of public enemies, the owners of the goods and their servants excepted. Proof that there is *no negligence in the* innkeeper or his servants, is not sufficient for his immunity." If this were to be understood in its most extensive signification, it certainly conflicts with the view taken by this court in *Merritt* v. *Claghorn,* (23 Vt. 177.) But the case of *Shaw* v. *Berry,* required no such extreme view. It was that of a traveler's horse breaking a leg in defendant's stable during the night, in a manner unknown to any one. In principle, the case was much the same with the present, and seems to have been tried, in the first instance, much as was this case, with a similar result. And there can be no doubt of the tavernkeeper's liability in such a case. And he could not ask a jury to exonerate him, upon the presumption of faithfulness, until he could show by evidence, either positive or circumstantial, how the injury did accrue, that the court and jury might determine whether it arose from any defect in the stable, or neglect of the innkeeper or his servants. Until that is made to appear, the law presumes, that it was the fault of the host, either mediately or immediately.

The case of *Berkshire Woolen Co.* v. *Proctor,* (7 Cushing 417,) seems to be an elaborate and satisfactory exposition of the law, but it does not come directly within the range of the present discussion. It is said in *Jones* v. *Thurlow,* (8 Mod. 172,) that the innkeeper has a lien upon the horse of his guest "for the meat of the horse, but not for the meat of the guest." But this distinction seems not to have been preserved in the later cases. It seems now to be considered that this lien extends to all the goods put into the keeping of the host, or forming the proper luggage of the traveler and his family, and the equipage and accompaniments of the horse and carriage. The lien and the liability seem to be co-extensive. (*Thompson* v. *Lacy,* 3 B. & Ald. 283: *Proctor* v. *Nicholson,* 7 Car. & P. 67.) It has recently been decided by the English courts (Law & Eq., *Armistead* v. *Wilde,* 17 Queen's Bench R. 261,) that if a guest is grossly negligent in exposing money, whereby it is stolen, he cannot recover for it. We have thus examined, in detail, almost every case bearing upon the points involved in the present one.